# WAVERLY OIL WORKS CO. v. R. B. EPPERSON, Inc.

No. 6641. Decided December 31, 1943. (144 P. 2d 286.)

*Irvine, Skeen & Thurman,* of Salt Lake City, for appellant.

*Romney & Boyer,* of Salt Lake City, for respondent.

WOLFE, Chief Justice.

Plaintiff originally filed this action in the City Court of Salt Lake City to recover an alleged indebtedness of

$514.24 upon an open account. The defendant answered, denying the indebtedness, and by way of counterclaim asserted that the plaintiff had agreed to reimburse defendant to the extent of $1,000 for radio advertising of the plaintiff's products by the defendant. It was further alleged that of this $1,000, $667 remained unpaid. By reply the plaintiff alleged that the defendant had been indebted $1,181.24 to the plaintiff; that the $667 referred to by the counterclaimant had been credited to this $1,181.24, leaving an unpaid balance of $514.24, the amount prayed for in the complaint. Upon a trial of the issues the court entered judgment on the complaint of no cause of action and awarded judgment of $667 for defendant on its counterclaim. From this judgment an appeal was prosecuted to the district court.

The district court found that the defendant had been indebted in the sum of $1,181.24 to the plaintiff on an open account; that plaintiff agreed in 1937 to pay the defendant $1,000 to reimburse defendant for radio advertising; that $333 of said sum was paid by the plaintiff in cash; and that the balance, $667, was paid in January, 1940, by the plaintiff allowing a credit to the defendant in the amount of $667 against the charges on the open account. This left a balance still owing by the defendant of $514.24. Plaintiff was awarded judgment for this latter amount and the defendant appeals.

On this appeal the defendant urges that the district court erred in finding that defendant was indebted to the plaintiff for any amount and in not finding that the plaintiff still owed the defendant the $667 for radio advertising. The only question raised by the appeal therefore is: Was the defendant indebted to the plaintiff to the extent of $1,181.24 or for any amount for goods sold and delivered? The District Court resolved this question against the defendant and found that defendant did owe the plaintiff $1,181.24. Unless this finding is against the clear preponderance of the evidence it must stand. *Harper*

v. *Tri-State Motors, Inc.*, 90 Utah 212, 58 P. 2d 18; *Greco* v. *Gentile*, 88 Utah 255, 53 P. 2d 1155.

In 1935 the plaintiff was engaged in the manufacture and sale of Waverly petroleum products throughout the United States. The defendant agreed to distribute and sell these products in the State of Utah and other portions of the intermountain territory. Originally the parties operated under an oral contract. However, in 1937 they executed a written contract which was essentially the same as the previous oral contract. This written contract so far as material here provided:

"Seller will furnish advertising matter as shown on its regular advertising price list in accordance with the prices shown thereon, and will furnish any material which is marked 'No Charge' free to Buyer.

"An allowance of one (1) cent per gallon shall be set up by seller for all gallonage handled by Buyer on Waverly High Speed Brand Motor Oil purchases only, credit to be allowed Buyer on proof of expenditure in the promotion of sales of Waverly High Speed Motor Oil."

The defendant, in accordance with this contract, ordered various advertising materials. These items were delivered by the plaintiff and a charge was levied according to the furnished price list. From 1935 until 1938 the defendant had been dealing with the plaintiff's vice-president, George E. Willey. During all of this time plaintiff carried on its books a merchandise account, to which all charges against the defendant for greases and oils were carried. From time to time cash payments were made on this account and it is apparently now paid in full. At the same time the plaintiff carried a separate "advertising account" to which all charges against the defendant for advertising materials were carried. During this three year period no cash payments were made on this advertising account. Willey testified that he did not believe that his company, prior to 1938, ever billed the defendant for payment of the advertising materials so furnished. Pursuant to the agreement the plain-

tiff credited the defendant with one cent per gallon for each gallon of Waverly Oil handled by the defendant.

It is clear from the evidence that both parties contemplated that as the defendant opened new territories, it would need relatively large quantities of advertising materials—and that the one cent allowance would not at the beginning pay for the necessary advertising materials. But as the territory was worked, sales were expected to rise and advertising costs were expected to decline so that eventually the advertising charges could be liquidated by this one cent allowance. Things did not develop as anticipated. The overdraft on this advertising account gradually accumulated until it reached nearly $1,500. On December 6, 1937, Willey, by letter, informed the defendant that he did not want the advertising account to grow any larger. He suggested that advertising matter be paid for in cash as needed until a reasonable reduction could be made in the account.

In 1938, a new corporation known as the Waverly Petroleum Products Company was organized by the plaintiff. Plaintiff informed the defendant on June 8, 1938, that in the future all Waverly brand products would be handled through the new company and the defendant would get oils and greases solely through it. Willey, with whom defendant had been dealing, was made president of the new company. On June 9th, 1939, Mr. Vockel, president of the plaintiff company, informed defendant that all indebtedness incurred prior to the organization of the new company would be payable at the plaintiff's office. Defendant was informed that "something" would have to be worked out on this advertising balance. In subsequent letters Vockel demanded that the defendant pay this account in cash.

The defendant admits that it ordered and received certain advertising materials from the plaintiff and that said materials were charged against the defendant on a special advertising account. Defendant also admits that the prices so charged were in accordance with a price list furnished

by the plaintiff. However, defendant contends that this advertising account was never to become a personal charge against it to be paid in cash, but that it was to be liquidated only in a specified manner; to wit, by the allowance by the plaintiff of one cent per gallon on all Waverly brand oils and greases handled by the defendant. Plaintiff contends that the account was a direct charge to be paid by defendant, but that defendant had the right to a credit of one cent per gallon for all Waverly oil and greases handled by it.

The provisions of the contract set out above do not expressly give the defendant the right to liquidate this account solely by the credit of the one cent allowance. Nor does it expressly provide that any overdraft in the account not liquidated by the said credit allowance was to be paid by the defendant in cash. The plaintiff points out that by the terms of the contract plaintiff agreed to furnish advertising materials at list price; that defendant admits that it ordered these materials; that they were delivered by the plaintiff and charged according to the list price; and that the contract merely gave the defendant the privilege of crediting this one cent allowance in liquidation of the account. Under these facts, as plaintiff contends, a promise to pay any overdraft remaining after the oil credit allowances had been given would ordinarily be implied by law. The defendant urges that the conduct of the parties over the three year period while the contract was in effect shows that the defendant was never to be called upon to liquidate this account in any manner except as it was absorbed by the oil credit allowance.

The conduct referred to by the defendant is evidenced by oral testimony and numerous letters introduced in evidence as exhibits. This evidence clearly shows that neither party contemplated that the overdraft on this advertising account would ever be allowed to get so large that the credit allowance on anticipated oil sales in the territory could not be reasonably expected to liquidate it. Willey testified that there was no stipulated time when he was to call a halt on

the amount of advertising materials that could be ordered— that it was a matter of judgment. He also testified that there was negligence in his office somewhere which permitted the account to get so large.

This evidence also shows that from 1935 until June, 1938, the defendant was never called upon to make a cash payment on this account. On various occasions the plaintiff, by mistake, included charges for advertising materials on a bill for other merchandise. Letters were introduced in which the defendant called these mistakes to the attention of the plaintiff. In answering letters the plaintiff explained the mistake and informed the defendant that the items had been taken off and carried to the special advertising account. Willey testified that he never told defendant that it would be expected to pay any overdraft in cash—that there was no occasion to so inform defendant.

In June of 1938 the plaintiff gave notice to the defendant that a new company had been organized partially "in anticipation of prospective legislation." The defendant was to secure its merchandise solely from this new company in the future. Under the new arrangements the defendant would not buy anything from the plaintiff, and consequently there was nothing upon which the plaintiff could continue to give defendant the one cent advertising allowance. The plaintiff still held an advertising account of nearly $1,500 against the defendant, while under the new arrangement the one cent allowance was no longer allowed by the plaintiff. The new company did continue for a while to give the defendant a one cent allowance for advertising and the defendant authorized said new company to pay this credit directly to the plaintiff company to be applied on the old advertising account. In this manner the balance of the account with the plaintiff was reduced to $1,181.24. At this point the defendant withdrew its authorization and thus prevented any such further reduction in the balance. Subsequently the new company discontinued the allowance of one per cent per gallon advertising credit.

The further correspondence does not indicate that the defendant thought its liability for this account had been cancelled by the new arrangement. The new company, which still allowed the one cent allowance, was authorized to pay this allowance to the plaintiff to reduce the advertising account. In a letter of June 21, 1938, after the new arrangement was in operation, the defendant by letter stated that the advertising account could be "whittled down" because of the fact that it was just getting into the peak season. Any oil credits which would be anticipated from this peak-season business would be credits from the new company. Thus the defendant must have at this time intended to apply this credit on the old account. Again in April, 1939, the defendant wrote asking the plaintiff "to check-off" the advertising account. It should be noted that at this time the one cent allowance had been stopped, yet the defendant recognized the fact that the account was standing as a charge on the plaintiff's books.

The first time it became clearly apparent that the one per cent allowance would never liquidate the overdraft was in 1938 after the new company had been organized and the plaintiff no longer sold merchandise to the defendant upon which the defendant could be allowed the one cent per gallon credit. At that time plaintiff made a demand that the defendant take care of this overdraft. Defendant's reaction was not to deny liability, but, on the contrary, it assured plaintiff that the account would be "whittled down." In late 1937 a firm of accountants auditing the defendant's accounts inquired of the plaintiff concerning this advertising account. The credit manager of the plaintiff stated that "theoretically" this account would be cancelled by the one cent per gallon credit, but that regularly more advertising had been furnished than the credit would cancel so that the balance gradually accumulated. The credit manager then informed the accountants that this balance was carried as an open charge against the defendant and that it should either be taken care of or the amount of advertising reduced in order

that the oil credits would cancel it. A few days later the defendant wrote to Willey, who was still the vice-president of plaintiff company, and informed him that defendant had told the accountants that the advertising account was to be absorbed through this one cent per gallon allowance and that in no event was any part of the account to become a charge against the defendant. Willey answered that it was true that this account was to be liquidated in this manner, but he also stated that this account still stood as a charge on the plaintiff's books. Willey also informed the accountants that this account was to be absorbed by the oil credits and that it would liquidate itself. It should be noted that at the time these letters were written (December 6, 1937) defendant was still purchasing oils from the plaintiff and was still getting the one cent allowance. The new company had not yet entered the picture. Both parties apparently still thought that the account could be liquidated in this manner. These letters do not, as defendant contends, show that the plaintiff agreed never to hold the defendant liable for this overdraft.

The express wording of the contract almost compels the conclusion that the defendant was to pay for any overdraft. By its terms certain materials were to be furnished free of charge; others were to be furnished in accordance with prices shown on plaintiff's regular price list. The defendant ordered the advertising materials and received them. A charge was made according to the agreed prices. The contract further provided that the defendant would be allowed the one cent per gallon credit on all oil purchased by it. This credit was given, but there still remained an unpaid balance. Under such circumstances the law will imply a promise to pay unless it is clearly shown that the parties had an express understanding that the balance was to be liquidated only by the one cent oil allowance. As shown by the evidence, no such express understanding is shown.

The lower court held that the defendant was liable for the overdraft and this holding is supported by the pre-

ponderance of the evidence. Judgment affirmed, costs to the respondent.

LARSON, McDONOUGH, MOFFAT, and WADE, JJ., concur.